UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.　　　　　　　　　　　　　　CASE NO: 8:09-CR-251-T-30MAP

DEMETRIUM SHAW
_____/

## ORDER

This cause comes on for consideration of Defendant's Amended Motion for New Trial (D-136), and the Government's Response in Opposition thereto (D-150).

Defendant was charged by way of a Superseding Indictment with conspiracy to possess with the intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 (Count One), possession with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count Two), and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Three). He proceeded to trial in October 26, 2009.

At trial, the Government presented testimony from numerous law enforcement witnesses. It further presented testimony of two witnesses who hoped to gain more favorable treatment in their own cases.

Eddie Light, a cooperating co-defendant, testified that

he had lived in Plant City prior to being incarcerated. (D-134, p. 7.) Light explained that he met Defendant in the fall of 2005 when Light was selling marijuana and crack on the streets. (Id. at p. 9-10.) Light testified that Defendant was a known drug dealer and drove a black Nissan Frontier. Light explained that the first time he dealt with Defendant on a "business level," Light flagged down Defendant to buy some crack and marijuana. (Id. at p. 11.) According to Light, Defendant became Light's supplier. (Id. at 13.) Light explained that eventually he started going to Defendant's house to buy drugs. (Id. at p. 14.) Light testified about the first occasion he went to Defendant's house. He explained Defendant, who had a person with him by the name of "Tahonie," picked Light up and drove to the house on Forrest Street to get the drugs. (Id. at p. 14-15, 18-19.)

Light testified about the four occasions on which undercover detectives bought drugs from Light. Light stated that he obtained the drugs from Defendant on three out of the four occasions. (Id. at p. 39-53; D-131, p.35.)

James Donnell Oner testified that he knew Defendant and identified him in court. (D-125, p. 7.) Oner testified that in the fall of 2006 he was selling crack and that his initial

supplier was Corey Dunn. (Id. at p. 8, 10.) According to Oner, Dunn told him that Defendant, who Dunn referred to as "Meechi," was Dunn's supplier. (Id. at p. 10-12.)

Oner testified about two occasions that he dealt with Defendant. The first occasion was when Dunn, Defendant, and "Carey" came to Oner's trap house in Lakeland. (Id. at p. 12.) Oner explained that he had called Carey to obtain crack cocaine and that Carey and Dunn showed up in a black four-door truck driven by Defendant. (Id. at 12-13.) Oner was certain it was a black truck. (Id. at p. 13, 38.) Oner explained that he got into the back of the truck and saw Defendant hand Carey a bag. Then Oner, Dunn, and Carey exited the truck and, once inside the trap house, Oner purchased approximately 13 packs with eight "rocks" each, equivalent to 42 grams of crack, for $900. Oner explained that the crack was retrieved from the bag Defendant gave to Carey. (Id. at p. 13-16.)

Oner testified that the second occasion he dealt with Defendant was around April 2007. Oner stated that he called Carey to buy some cocaine for a friend he identified as Rod Bogan. Oner explained that he drove to Plant City to Defendant's house where Defendant was waiting in his truck. According to Oner, Defendant sent Carey into the house and

when Carey returned, Carey and Oner got into Defendant's truck. Oner testified that Carey then weighed the cocaine and Oner paid Defendant $1,600 for the drugs. (Id. at p. 16-19.)

Oner testified that after the second occasion he had no further direct contact with Defendant. (Id. at p. 20.) He said he continued to buy crack cocaine from Dunn and on a few occasions he took Dunn to Defendant's house to obtain the drugs. (Id. at p. 20-23.) Oner testified that Dunn told him he was getting the crack from Defendant. (Id. at p. 24.)

On cross-examination, Oner testified that he knew Eddie Light and that they had the same attorney. (Id. at p. 28.) Oner explained that he met Light in the Pinellas County Jail and that they were housed in the same dorm unit. According to Oner, when Light told Oner about Light's drug charges, Oner advised Light that he should try to reduce his sentence by cooperating. (Id. at p. 29-30.)

Oner testified that Light told him that Light was cooperating against Defendant and that Defendant was going to trial. (Id. at p. 32-33.) After Oner learned from Light that Defendant was awaiting trial, Oner asked his attorney to contact law enforcement about Oner providing cooperation as well. (Id. at p. 36. 43.) Oner admitted that he didn't tell

Light he wanted to cooperate against Defendant. According to Oner, when Light learned that Oner was going to testify on the Government's behalf at Defendant's trial, Light became angry and stopped talking to Oner. ( Id. at p. 43-44.) Oner testified that he and Light never discussed details of their testimony and never discussed the color of Defendant's truck. (Id. at 44-45.)

On October 29, 2009, the jury found Defendant guilty of conspiracy to possess with the intent to distribute cocaine base and possession with the intent to distribute cocaine base. They found him not guilty of the gun violation charged in Count Three of the Indictment. Defendant has not yet been sentenced. Defendant's original sentencing date set for January 2010 was continued in light of Defendant's first motion for new trial filed on December 13, 2009. Because Defendant failed to submit any actual evidence supporting his first motion for new trial, the Court denied the motion without prejudice to Defendant refiling the motion with supporting evidence.

Defendant filed the instant motion for new trial on March 24, 2010. He seeks a new trial based on what he alleges to be "newly discovered evidence." First, Defendant relies on a

September 30, 2009, jail phone call which he contends demonstrates that Oner fabricated his testimony and committed perjury. Specifically, Defendant argues that the phone call shows that Oner did not actually know the Defendant and did not know what Defendant looked like, but rather gathered information about Defendant so Oner could testify against Defendant in an attempt to get his sentence reduced. Second, Defendant submits a letter from Corey Dunn who disputes Oner's testimony that Dunn had a relationship with Oner and had been to Defendant's home. Third, Defendant proffers that Tahonie Joyce would testify that Light falsely testified that (1) Defendant picked Light up in a black truck; (2) Tahonie was present; and (3) Defendant provided drugs to Light. Finally, Defendant contends his truck was not black prior to March 2009, and submits an undated photo of a sand-colored truck. Defendant requests an evidentiary hearing.

The Government argues that the evidence Defendant now submits does not constitute "newly discovered evidence" because Defendant has failed to demonstrate that the evidence was unavailable until after trial or that he could not have exercised due care to discover the evidence prior to or during the trial. The Government further argues that the evidence

is: (1) merely cumulative or impeaching, (2) immaterial, and (3) not of such a nature that it likely would produce a different result. The Government also argues that Defendant is not entitled to an evidentiary hearing.

## Discussion

A motion for new trial based on newly discovered evidence must be filed within three years of the verdict or the finding of guilty. Fed.R.Crim.P. 33(b)(1). In order to obtain a new trial based on newly discovered evidence, Defendant must show the following: 1) the evidence was discovered after the trial; (2) Defendant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) based on the evidence a new trial would probably produce a different result. United States v. Schlei, 122 F.3d 944, 991 (11th Cir. 1997). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." United States v. Lee, 68 F.3d 1267, 1274 (11th Cir. 1995). Furthermore, unsubstantiated accusations and allegations do not establish the foregoing elements. United States v. Elso, No. 07-12605, 2010 WL 438364, at *1 (11th Cir. Feb 8, 2010) (per curiam). Motions for new trial based on newly discovered evidence are

highly disfavored. United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006). A motion for new trial should be granted only with "great caution." Id.

With the foregoing standard in mind, the Court turns to the evidence submitted by Defendant in favor of his motion for new trial.

I. **JAIL RECORDING**

Defendant primarily relies on a September 30, 2009 jail recording of a phone call in support of his contention that Oner "concocted a plan to be able to identify the Defendant if the Government presented him with a line up." (D-136, p. 4.) Defendant contends that the jail recording demonstrates that Oner had a "premeditated plan to fabricate a story and mislead the jury." (Id. at p. 14.) Defendant specifically relies on a portion of the recording during which Oner asked someone to send him a recent booking photograph of Defendant so that Oner could identify him if the Government showed him a lineup.

While Defendant did not discover the recording until after trial, the Court need not determine whether the Defendant exercised due diligence in discovering the recording. At most, the evidence is impeaching and is not such that it would probably produce a different result if it

was presented at a new trial.

In this regard, after having listened to the entire September 30, 2009 recording of the phone conversation (D-139)[1], which occurred the day after Oner had been sentenced in his own federal case, it is clear that both Oner and his girlfriend in fact knew Defendant.[2]

The recording reveals that Oner called his sister Katina. He then asked her to call his girlfriend "Leesha," who Katina contacted via another phone. Oner specifically asked Katina to ask Leesha, "what she said about what I gotta do about the court situation." Oner repeated, "ask her what she says about me getting on the stand." Katina repeated Oner's question to Leesha and then told Oner that Leesha was around the corner from Katina's home and would come talk to Oner.

When Leesha arrived and got on the phone with Oner, she

---

[1] Neither party provided a full transcript of the recording. Defendant provided a transcript of portions of the conversations. That transcripts includes some misstatements and several significant omissions.

[2] In his reply brief related to his first motion for new trial, Defendant identified Oner's girlfriend as Alisha Bates. Furthermore, Defendant stated that he and Bates dated in the late 1990's. (D-120, p. 2.) Defendant did not restate this information in his second motion for new trial.

specifically asked, "you talking about Meechie?"[3] (D-136, p. 5.) Throughout the conversation, Oner and his girlfriend refer to Defendant as "Meechie." Oner asked Leesha if she or her brother, Entebbe[4], will be mad at him if Oner testifies against Defendant. (Id. at p. 7.) Leesha responded, "I wouldn't do it....He got a doo-doo bag, he can't walk."[5] (Id.) Oner responded that, "he sold dope with that doo-doo bag," "he sold drugs with that doo-doo bag," to which Leesha responded, "I feel bad for him." (Id.) Oner then argued with Leesha, "So what you want me to keep 15 years and just do the shit, huh?" Leesha responded "what your friends for?," "tell me what your friends for?"[6]

As the conversation continued Oner told Leesha that Oner would have to get on the stand at Defendant's trial, and

---

[3] Witnesses at trial testified that Defendant's nickname was "Meechie" or "Metri."

[4] "Entebbe" appears to be a reference to Entebbe Bates, who was listed as a Government witness but was not called to testify at Defendant's trial. (D-99.)

[5] This is an apparent reference to the fact that Defendant has a colostomy bag and is a paraplegic.

[6] This part of the conversation occurs on the recording between 7:45 and 8:05 minutes. Defendant did not include in the partial transcript this exchange, but rather referred to this portion of the phone call as involving "other personal discussion not relevant to this case." (D-136, p. 8.)

Leesha responded that Defendant's mother tried to talk Defendant out of going to trial but that "he don't listen." (Id. at 8-9.) Oner stated that Defendant would "be in a wheelchair" and that "I just got to get up there and say what I done bought from him and when I dealt with him."[7]

At approximately, 16 minutes and 20 seconds into the call, Katina returned to the line and began conversing with Oner. Oner asked her to use a computer to find a recent jail picture of "Demetrius Shaw" and mail it to him because he believed that "they going to bring a lineup and I don't remember how the dude look...."[8] (Id. at p. 11.) Oner continued, "I remember how he look but I need to know...," but Katina interrupted and expressed concerns about other persons having the same name. Oner told her that Defendant was from Plant City and was approximately the same age as Oner. When Katina asked if Leesha knew what Defendant looked like, Oner responded, "Yeah." (Id. at p. 11-12.)

In short, the conversation demonstrates that Oner was

---

[7] Defendant's transcript incorrectly reflects that Oner stated, "I just to get up there and say when I dealt with him and what I bought from him." (D-136, p. 9.)

[8] The transcript provided by Defendant inaccurately reflects that Oner stated, "I don't **know** how the dude look, you feel me?" (Id. at p. 11.) Oner can be heard on the audio as saying, "I don't **remember** how the dude look...."

-11-

very familiar with Defendant. Oner made statements evidencing that he was aware of personal details relating to Defendant such as Defendant's nickname, where he lived, his age, and the fact that Defendant used a wheelchair. Oner referred to having bought drugs from Defendant and stated he remembered how Defendant looked. The conversation certainly does not support a finding that Oner fabricated a story to mislead the jury. At most, Oner's request that his sister send him a picture of Defendant would constitute impeachment evidence, and does not justify a new trial.

To the extent that Defendant raises a Brady issue, there is no evidence that the Government was even aware of Oner's request that his sister send him a copy of Defendant's mug shot. Furthermore, the Court finds that there is not a reasonable probability that the outcome of trial would have been different had Defendant been aware of the evidence. Nor is the evidence of the type such that it would likely produce a different outcome at a new trial when faced with the other evidence presented by the Government.

At the trial, Detective Bryan Bennett testified about multiple undercover crack purchases he made from Darian Betard. Detective Bennett said that after the first purchase,

Betard gave Bennett his cell phone number. On at least three occasions, Betard told Detective Bennett to meet him at 106 Forest Street. Each time, Betard entered and exited the residence prior to handing over the crack cocaine to Bennett.

Detective William Simms testified about the four occasions during which he bought crack cocaine from Light. On the first occasion Detective Simms bought from Light, Light told him he needed to go somewhere to get the crack cocaine. Detective Simms drove Light to 106 Forest Street. Light entered the side of the home and returned with a quarter ounce of crack cocaine. Several days later Detective Simms requested another quarter ounce of crack cocaine. Light told him he'd have to go get it again. On March 18, 2009, Detective Simms called Light and requested another quarter ounce. Light told him to meet him at 106 Forest Street. When Detective Simms drove up, Light entered the house. When Light exited the house and approached Simms, Simms requested a second quarter ounce. Light reentered the house and returned with the 14 grams of crack cocaine.

Based on these purchases, law enforcement sought a search warrant for 106 Forest Street. Law enforcement executed the warrant on April 3, 2009. Various members of law enforcement

testified about the evidence seized from the master bedroom and kitchen of the house. The evidence seized included various documents, receipts, and bills belonging to Defendant and drug paraphernalia such as different size baggies, cocaine residue, and several scales.

The law enforcement witnesses further testified that Defendant and Betard were in Defendant's truck on the property when law enforcement arrived. A search of the truck revealed a black book bag behind the driver's seat. The bag contained a baby wipes container containing crack cocaine, a cooler containing re-rocked cocaine, various baggies, a scale and razor blades. Defendant's cell phone was found to include the cell phone numbers for Light and Betard. Additionally, Defendant was found to have $1284 on his person.

Given the foregoing evidence presented to the jury, Defendant has not shown that the September 30, 2009 recording is so material that it would have resulted in his acquittal.

## II. COREY DUNN LETTER

Next, Defendant relies on a letter dated March 8, 2010, purportedly signed by Adrian C. Dunn. Dunn's letter is unsworn. Dunn writes:

> I, Corey Dunn, am writing to notify the courts that I did not have a relationship with James Oner

in 2007. All the statements that were made against Demetrium Shaw by James Oner in connection to my involvement of any illegal transactions were false statements. I have never been to Demetrium Shaw house with James Oner or anyone else.

(D-136, Exh. 3.)

Defendant claims the statement from Dunn is new because his counsel was unable to locate Dunn until "well after trial and could not get him to give a sworn statement about the accusations until March 8, 2010." (D-136, p. 12.) However, Defendant fails to offer any explanation of his efforts to locate Dunn (who apparently is incarcerated) or when he actually located Dunn.[9] Nor has Defendant explained why Dunn refused to provide his letter earlier. Additionally, Defendant did not request the Court to subpoena Dunn after hearing Oner's trial testimony, nor did he request a brief continuance so that he could attempt to locate Dunn and speak with him. Thus, Defendant has failed to demonstrate that Dunn's statement could not have been discovered with due diligence.

Furthermore, Defendant has failed to show that Dunn's

---

[9] Defendant's first motion for new trial makes no mention of Dunn. It was not until Defendant filed his reply brief in January 2010, three months after the trial, that Defendant first argued that Dunn would dispute Oner's testimony. (D-120, p.1.) Defendant states that he was unable to get a statement from Dunn until March 8, 2010. (D-136, p. 12.)

statement is of such a nature that a new trial would probably produce a different result.

### III. TAHONIE JOYCE

Defendant next proffers as new evidence that Tahonie Joyce, if subpoenaed to testify, would refute Eddie Light's testimony that Joyce was riding in Defendant's black truck on the first occasion Light bought drugs from Defendant.

First of all, Defendant fails to provide an explanation as to why Joyce's proffered statement was not available at the time of trial. Defendant also has not shown that he exercised due diligence in discovering Joyce's statements. Notably, defense counsel requested a sidebar when Light referred to Joyce during Light's testimony. Counsel advised that he represented Joyce in both state and federal criminal cases in 2007. Defense counsel further advised that Joyce was serving a fifteen year sentence in federal prison. Defense counsel advised that he and Joyce remained in contact as Joyce was working with law enforcement in an attempt to reduce his sentence. (D-134, p. 16-17.) When defense counsel stated he thought it appropriate to speak with Joyce to determine if he had an information material to Defendant's case, the Court advised defense counsel that he could "follow-through on it to

whatever degree and whatever measure you feel is appropriate." (Id. at p. 17.)

Despite this exchange, there is no evidence that Defendant actually attempted to contact Joyce during the trial. Defendant did not request the Court to subpoena Joyce to testify at the trial, nor did he request a continuance in an attempt to determine whether Joyce's testimony would have been helpful to the defense. Defendant fails to provide any explanation as to why five months elapsed before Defendant was able to "discover" Joyce's information.[10] As such, Defendant again has failed to demonstrate that this evidence could not have been discovered using due diligence.

Furthermore, Defendant did not even submit an affidavit or sworn statement from Joyce. While the defense proffers that Joyce will testify on Defendant's behalf if subpoenaed, Defendant, through counsel, candidly admits that "Tahonie Joyce was not interested in signing affidavits." (D-136, p. 13.) The fact that Joyce refused to sign an affidavit or sworn statement significantly calls into question the reliability of the proffer.

---

[10] Defendant did not raise any new evidence relating to Joyce in his original motion or reply brief. ..

Finally, Defendant has failed to show that Joyce's proffered statement would likely have produced a different result.

## IV. PHOTO OF TRUCK

Defendant's final piece of evidence submitted in support of his motion for new trial is a photograph of a light-colored Toyota Frontier truck. (D-136, Exh. 4.) Defendant contends that an investigator "retrieved photographic evidence of the color of the Defendant's vehicle prior to March 2009. Specifically during the years 2006-2008." (D-136, p.13.) Defendant contends that this evidence further supports a finding that Oner's testimony was fabricated.

Significantly, Defendant fails to present any evidence relating to when the photograph was taken. Furthermore, Defendant fails to explain why he could not have located the photograph prior to or during the course of his trial. Certainly, Defendant was aware prior to trial that his truck, at some point, had been another color.[11]

Additionally, Defendant had at his disposal other evidence relating to the truck's color. Specifically,

---

[11] In his first motion for new trial and reply brief, Defendant contended that he had the truck painted black in early 2009. (D-115, p.3; D-120, p. 2.).

Government's Exhibit 47 was admitted into evidence at trial. This exhibit, which Deputy Negron-Matias testified was found in Defendant's Nissan Truck, is an Odometer Disclosure Statement dated June 11, 2004. The document was signed by Constance D Thomas, apparently Defendant's relative, and lists Defendant's address on Forest Street. The document describes the truck's color on that date as "sand dune." (D-98, GX 47.)

At trial, defense counsel specifically asked Oner on cross-examination if he was certain the truck was black. (D-136-2, p. 37-38.) Nonetheless, Defendant did not present any evidence that the truck was a color other than black. Nor did defense counsel choose to use the Odometer Disclosure Statement in his cross-examination of either Oner or Light.

Defendant has thus failed to show that the evidence is new, nor has he demonstrated that the that the photograph could not have been obtained for trial in the exercise of due diligence. Additionally, Defendant has failed to demonstrate that the evidence is not merely impeaching. Finally, the evidence is not such that it would have produced a different result had it been presented at trial.

## V. EVIDENTIARY HEARING

It is not necessary to hold an evidentiary hearing when

the resolution of a motion for new trial is clear. <u>United States v. Jernigan</u>, 341 F.3d 1273, 1289 (11th Cir. 2003). The Undersigned was the trial judge in this case, and a district court's familiarity with a case can allow the court to rule on a motion for a new trial based on new evidence without holding an evidentiary hearing. <u>See</u> <u>Schlei</u>, 122 F.3d at 994. The Court finds no evidentiary hearing is warranted in this case.

It is therefore ORDERED that:

1) Defendant's Amended Motion for New Trial (D-136) is DENIED.

2) Defendant's sentencing is rescheduled for July 8, 2010, at 10:30 a.m., Courtroom TBA, Sam M. Gibbons United States Courthouse, 801 N. Florida Ave., Tampa.

DONE AND ORDERED in Tampa, Florida, this 17th day of May, 2010.

WILLIAM J. CASTAGNA
SENIOR UNITED STATES DISTRICT